# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

PINNACLE ARMOR, INC.,

      **Plaintiff,**

  v.

UNITED STATES OF AMERICA,

      **Defendant.**

1:07-CV-01655 LJO DLB

**ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT (DOCS. 98 & 99)**

## I. **INTRODUCTION**

Plaintiff Pinnacle Armor, Inc. ("Pinnacle" or "Plaintiff") produces armor designed to protect buildings, vehicles, and the human body. Doc. 6, Verified First Amended Complaint ("FAC") at ¶ 2.[1] Among Pinnacle's primary customers are local law enforcement agencies that often utilize federal subsidies to purchase body armor. *See id*. at ¶¶ 4-5, 22. Availability of at least one such subsidy is conditioned upon certification that the body armor was manufactured in compliance with the most recent standards set by the National Institute of Justice ("NIJ"), an arm of the U.S. Department of Justice ("DOJ"). *Id*. at ¶ 4. In the FAC, Pinnacle alleged that NIJ's decision to revoke certification for one of Pinnacle's products: (1) violated Pinnacle's procedural due process rights under the Fifth Amendment; and (2) was "arbitrary and capricious" in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). *Id*. at ¶¶ 42-57.[2] *Id*.

On March 11, 2008, the district court dismissed both claims, holding that Pinnacle's interest in NIJ certification is not a protected property right under the due process clause, and that NIJ's

---

[1] Normally, the Court would cite the Revised Administrative Record ("RAR") for foundational facts such as this. Here, however, the RAR does not appear to contain relevant foundational information about Pinnacle. As these basic facts are set forth in the FAC and do not appear to be disputed, the Court will cite the FAC for the limited purpose of providing background information.

[2] The FAC also included equal protection and Freedom of Information Act claims. Doc. 6. Plaintiff voluntarily dismissed these claims. *See* Doc. 17-1 at 2 n. 2.

certification decision is exempt from review under the APA because the certification process is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). Doc. 22. Pinnacle appealed. Doc. 24. The Ninth Circuit affirmed on the Fifth Amendment claim, but reversed and remanded on the APA claim, directing the district court to conduct further proceedings. Doc. 35; *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708 (2011).

Before the Court for consideration are cross motions for summary judgment on the merits of Plaintiff's APA claim. Docs. 98-99. Defendant's opening brief was filed July 19, 2013, Doc. 98-1; Plaintiff filed a combined cross-motion and opposition on August 23, 2013, along with a request for judicial notice, Docs. 99-100; Defendant filed a combined opposition/reply on September 13, 2013, Doc. 102; and Plaintiff filed a combined opposition/reply on October 4, 2013, Doc. 103. Upon review of the Parties' submissions, the Court finds that oral argument will not aid resolution of the disputes. Accordingly, the matter is decided on the papers pursuant to Local Rule 230(g).

## II. BACKGROUND

A.    Facts.

The pre-remand factual history is summarized succinctly in the Ninth Circuit's decision:

> As part of the Department of Justice, the NIJ is authorized to "improv[e] Federal, State, and local criminal justice systems and related aspects of the civil justice system [by] identifying programs of proven effectiveness ... or programs which offer a high probability of improving the functioning of the criminal justice system." 42 U.S.C. § 3721. The NIJ, through its Office of Science and Technology ("OST"), establishes and maintains performance standards for bulletproof vests and other law enforcement technologies. 6 U.S.C. § 162(b)(3), (b)(6). The OST is charged with "establish[ing] and maintain[ing] a program to certify, validate, ... or otherwise recognize law enforcement technology products that conform to standards established and maintained by the Office...." *Id.* § 162(b)(4).
>
> One of the programs the NIJ manages is the Body Armor Compliance Testing Program. Under this program, a manufacturer may submit its body armor to the NIJ for a determination of whether the armor complies with the NIJ's performance standards. If the product satisfies the standards, the NIJ includes it on a list of compliant body armor models. A product reaps a substantial benefit if it is found compliant: When state and local law enforcement agencies purchase body armor listed as "compliant" by the NIJ, the federal government subsidizes up to fifty percent of the purchase. *See* 42 U.S.C. §§ 3796ll, 3796ll–2.

2

The NIJ issued compliance standards in 2001. *See* Nat'l Institute of Justice, U.S. Dept. of Justice, Ballistic Resistance of Personal Body Armor, NIJ Standard—0101.04, Revision A (June 2001) [hereinafter "NIJ Standard—0101.04"]. After it learned that certain body armor models could wear out prematurely and that its 2001 compliance requirements did not adequately address this concern, the NIJ issued supplemental performance standards for body armor in 2005. *See* Nat'l Institute of Justice, U.S. Dept. of Justice, NIJ 2005 Interim Requirements for Bullet–Resistant Body Armor (Sept. 26, 2005) [hereinafter "2005 Interim Requirements"], [internet citation omitted]. In order to maintain compliance, the 2005 Interim Requirements require the manufacturers of body armor to submit either "evidence ... that demonstrates to the satisfaction of the NIJ that the model will maintain ballistic performance (consistent with its originally declared threat level) over its declared warranty period," or a "written certification" by a manufacturer's officer stating that the officer believes the model will maintain ballistic performance; that the manufacturer has objective evidence to support that belief; and that the officer agrees to provide the NIJ with the evidence "promptly on demand" by the NIJ. The requirements provide that the NIJ will revoke a model's compliance status "at any time" if the evidence submitted by the manufacturer was "insufficient to demonstrate to the satisfaction of NIJ that the model w[ould] maintain its ballistic performance" over the model's declared warranty period.

Pinnacle manufactures body armor used by state and local government law enforcement agencies. One of its models, patented as "dragon skin," consists of overlapping ceramic discs, which allow the vest to be more flexible than other bulletproof vests. The parties do not dispute that dragon skin met the NIJ's 2001 requirements. *See* NIJ Standard—0101.04. The issue here is dragon skin's compliance with the 2005 Interim Requirements. To comply with the 2005 Interim Requirements, Pinnacle's officer issued a written certification declaring that he believed the vests would maintain their ballistic performance over the warranty period, that he had objective evidence to support this belief, and that he would submit the evidence to the NIJ on demand. In December 2006, the NIJ issued a Notice of Compliance to Pinnacle certifying that dragon skin, which had a six-year warranty period, was compliant with the NIJ's 2005 standards. Relying on this notice, Pinnacle spent hundreds of thousands of dollars producing vests for law enforcement agencies.

Subsequently, the NIJ received information from the Department of Defense that questioned the dragon skin model's durability under environmental stressors. The NIJ was particularly concerned about the effects of "temperature extremes and cycling" on the dragon skin model over time. Consistent with the 2005 Interim Requirements, the NIJ asked Pinnacle in June 2007, to provide documentation of the "data or other objective evidence that supports Pinnacle Armor's belief that [the dragon skin] model ... will maintain its ballistic performance (consistent with its originally declared threat level) over its declared warranty period of six years." In response, Pinnacle submitted testimonials of those who wore the dragon skin vest for over one year, photographs of armor panels, and a test report on a vest that had been turned in after four years of service. The NIJ found that this evidence was "insufficient to demonstrate to the satisfaction of NIJ that the model ... will maintain its ballistic performance ... over its declared warranty period." The NIJ stated that as of August 3, 2007, the dragon skin model would no longer be deemed compliant with the NIJ requirements and published statements to that effect.

648 F.3d at 711-14.

3

Also on August 3, 2007, NIJ, through DOJ's Office of Justice Programs, issued a press release stating that Plaintiff had not provided evidence sufficient to demonstrate to the satisfaction of NIJ that the Dragon Skin armor would maintain its ballistic performance over its declared 6-year warranty period. RAR 415.

**B.   Procedural History.**

As discussed above, Pinnacle alleged that NIJ's decision to revoke certification for the Pinnacle' product in question: (1) violated its procedural due process rights under the Fifth Amendment; and (2) was "arbitrary and capricious" in violation of the APA, 5 U.S.C. § 706(2)(A). Doc. 6, FAC. The district court dismissed both claims. Doc. 22. The Ninth Circuit affirmed on the Fifth Amendment claim, finding that the Due Process Clause does not require that NIJ grant a formal hearing before revoking a finding of compliance with its standards. 648 F.3d at 717. All that is required is "notice and an opportunity for hearing appropriate to the nature of the case." *Id* (emphasis in original). The Ninth Circuit found NIJ's procedures provided Pinnacle a "full and fair opportunity to be heard on its claims." *Id*.

The district court found that because the then-operative 2005 Interim Requirements provided NIJ discretion to remove armor from its compliance list "without statutory restraint," NIJ's actions in this case were unreviewable under 5 U.S.C. § 701(a)(2), which precludes review of "agency action [that] is committed to agency discretion by law." The Ninth Circuit reversed, reasoning that "together, the 2005 Interim Requirements and the statute supply [a] standard against which we can judge the agency's decision-making." *Id*. at 719-20.

**C.   The "06 Standard" and Mootness on Appeal.**

In 2008, during the pendency of the appeal, NIJ published a new set of requirements for the Body Armor Compliance Testing Program ("BACTP"). *Id*. at 714. The United States argued before the

4

Ninth Circuit that the entire appeal was moot because the 2008 requirements, set forth in NIJ Standard -

0101.06 (the "06 Standard"), superseded the 2005 Interim Requirements at issue in this case. *Id.*

Among other things, the 2008 requirements state:

> Publication of this revision of the standard does not invalidate or render unsuitable any body armor models previously determined by NIJ to be compliant to either the NIJ 2005 Interim Requirements or the NIJ Standard-0101.04 Rev. A Requirements.

06 Standard, Doc. 53-3, at v. Focusing on this language, the Ninth Circuit refused to find the appeal

moot:

> In order to be listed as compliant with the 2008 requirements, body armor must be submitted to and tested by the NIJ. The NIJ's new requirements are accompanied by sample laboratory configurations to help manufacturers prepare their products for the NIJ's tests. Although the NIJ accepted a written certification from an officer or independent evidence to establish conformity with its requirements under the 2005 Interim Requirements, under the 2008 requirements it no longer does so. Importantly, the 2008 requirements do not "invalidate or render unsuitable any body armor models previously determined by NIJ to be compliant [under] the NIJ 2005 Interim Requirements," but advise agencies to "always require their procurements to meet or exceed the most recent and up-to-date version of this standard."

> ***

> The 2008 Requirements explicitly state that they did not "invalidate or render unsuitable any body armor models previously determined by the NIJ to be compliant [under] the NIJ 2005 Interim Requirements." Thus, if Pinnacle succeeds on its claim and the court declares that its armor was compliant with the 2005 Interim Requirements, its armor will be presumptively compliant under the current standards. In this way, the 2005 Interim Requirements continue to have a "brooding presence, cast[ing] what may well be a substantial adverse effect on the interests of the petitioning parties." *Headwaters,* 893 F.2d at 1015 (quotation marks omitted).

> The government argues that "any manufacturer wishing to participate in the Compliance Testing Program must submit its body armor for testing under the new [standards].... even if NIJ previously determined the body armor model compliant with the NIJ 2005 Interim Requirements." But this is a misstatement of the requirements. The 2008 requirements clearly state that if the armor was compliant under the 2005 Interim Requirements, it is still compliant under the 2008 requirements and does not need to be retested. Therefore, because the 2008 requirements do not require retesting of the armor deemed compliant under the 2005 Interim Requirements, whether the dragon skin model was compliant with the 2005 Interim Requirements remains a "present controversy."

5

*Feldman,* 518 F.3d at 642 (citation omitted). The 2008 Requirements have no impact on this controversy.

*Id.* at 714-15 (emphasis added). In sum, the Ninth Circuit interpreted the 06 Standard's statement that "[p]ublication of this revision of the standard does not invalidate or render unsuitable any body armor models previously determined by NIJ to be compliant [under the 2005 Interim Requirements]" to mean that any armor compliant with the 2005 Interim Requirements was presumptively compliant with the 06 Standard.

**D.     Post-Remand Developments.**

On June 29, 2011, in response to the Ninth Circuit's "presumptive compliance" holding in *Pinnacle Armor,* 648 F.3d at 715, the NIJ issued an "Administrative Clarification" of the 06 Standard. *See* Doc. 53-2, ¶ 5 & Ex. 2. The Administrative Clarification directly addresses the 06 Standard's statement that that "[p]ublication of this revision of the standard does not invalidate or render unsuitable any body armor models previously determined by NIJ to be compliant [under the 2005 Interim Requirements]," by clarifying that this language was intended "to make clear to criminal justice agencies that the release of a new standard should not be interpreted as a recommendation to remove body armor from service which had been previously found compliant by the NIJ [Compliance Testing Program] with a previous version of the standard." *Id.,* Ex. 2. The NIJ reiterated: "an agency's older armor may be considerably preferably to no armor at all until new armor determined by the NIJ CTP to be compliant with the current standard can be obtained." *Id.* Critically, "[t]he statement that older armors may not necessarily be considered to be 'unsuitable' for continued use in service until replaced <u>should not be read to suggest – in any way – that an armor model's compliance with a predecessor standard somehow equates to compliance under the most current, superseding standard</u>." *Id.* (emphasis added).

Although the NIJ-administered Bulletproof Vest Partnership ("BVP") grant program does not prohibit participating state and local law enforcement agencies from using their own funds to procure

6

armor that does not comply with the most current NIJ standard, federal BVP grant money can only be used to purchase armor models NIJ has deemed in compliance with the most recent current standard. *Id.* at ¶¶ 6-7. All armor models, including models found compliant under an old standard, must be tested against the 06 standard to be included on the Listing of Compliant Armor and thus eligible for federal grant money. *Id.* at ¶¶ 5-6.

**E.     Post Remand Motions to Dismiss.**

On May 31, 2012, Defendant, the United States of America, moved to dismiss the remaining APA claim pursuant to Fed. R. Civ. P. 12(b)(1), arguing that subsequent regulatory activity rendered moot any dispute about its decision under a now-superseded regulation. Doc. 53. That motion was denied without prejudice. Doc. 61.

On November 26, 2012, Defendant's third motion to dismiss this case as moot was denied, as was Defendant's motion for summary judgment that Plaintiff lacked standing to sue. Doc. 69. Defendant also moved for summary judgment on the merits of the APA claim, arguing that it lawfully revoked certification for Dragon Skin. Doc. 64-1. In response, Plaintiff requested deferral of any merits ruling to allow time for Plaintiff to obtain additional evidence. The Court denied Plaintiff's generic request for discovery. Doc. 69 at 22. Although the Court found the 56(d) showing to be "weak," the Court nevertheless deferred decision on the merits to "permit a closer examination of whether the Revised Administrative Record [("RAR")], Doc. 60, should be supplemented to include documents already in Plaintiff's possession." Doc. 69 at 22.

Plaintiff then filed a motion to supplement the administrative record with twenty-six (26) documents, Doc. 71, which was granted in part and denied in part by an Order permitting consideration of three of those documents, Doc. 81.

# III. <u>REQUEST FOR JUDICIAL NOTICE.</u>

As a general matter, subject to some limited exceptions, the APA limits the scope of judicial review to the administrative record. 5 U.S.C. § 706 (directing the court to "review the whole record or those parts of it cited by a party"); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review ... to the agency decision based on the record the agency presents to the reviewing court."). The appropriate scope of review is normally limited to "the administrative record in existence at the time of the [agency] decision and [not some new] record that is made initially in the reviewing court." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2004).

Having had its motion to supplement the administrative record denied in large part, Plaintiff now attempts to place additional materials before the Court through a request for judicial notice. Specifically, Plaintiff requests judicial notice of Exhibits O, P, S, and V, which were attached to Plaintiff's original complaint. *See* Doc. 100-3; Doc. 2. Omitted from Plaintiff's motion is any explanation of how these documents satisfy the judicial notice standard. A court may only take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

The first two documents, Exhibits O and P, contain communications and data ostensibly shared by Pinnacle with individuals at NIJ. Exhibit S is an open letter with attached data drafted by a sales manager at Morgan Advanced Ceramics. There is absolutely no basis in the law for the Court to take judicial notice of the content of these documents; they would only be judicially noticeable for the purpose of establishing that the documents were presented as attachments to the Complaint:

> While a court may take judicial notice of a judicial or administrative proceeding which
> has a direct relation to the matters at issue, a court can only take judicial notice of the

*existence* of those matters of public record (the existence of a motion or of representations having been made therein) but not of the *veracity* of the arguments and disputed facts contained therein. Similarly, a court may take judicial notice of the existence of certain matters of public record. A court may not take judicial notice of one party's opinion of how a matter of public record should be interpreted.

*United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) (citations omitted).

Exhibit V is an NIJ powerpoint presentation, which, among other things, states "no accepted test protocol exists to evaluate the performance of used body armor over a period of years." Doc. 2-23 at 7. Defendants do not dispute the authenticity of the slides. Although it is permissible to take judicial notice of a public record such as this presentation for purposes of establishing what was presented, not the truth of that material, it appears that essentially identical information can be found elsewhere in the RAR. *See* RAR 122. The Court declines to take judicial notice of duplicative evidence.

Plaintiff's request for judicial notice is DENIED.

## IV. <u>STANDARDS OF DECISION</u>

### A.    <u>Administrative Procedure Act.</u>

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.[3] Pursuant to the APA, a Court shall "hold unlawful and set aside agency action … found to be:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

---

[3] Where no other statute provides a right of action, the "agency action" at issue must also be "final agency action." 5 U.S.C. § 704. "A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." *Id.* "Agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." § 551(13). The parties do not dispute that NIJ's decertification constituted final agency action.

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).[4]

**B.      Summary Judgment in APA Cases.**

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court conducting APA judicial review may not resolve factual questions, but instead determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). "[I]n a case involving review of a final agency action under the [APA] ... the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record." *Id*. at 89. In this context, summary judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id*. at 90.

Local Rule 260(e) directs that each motion for summary judgment shall be accompanied by a "Statement of Undisputed Facts" that shall enumerate each of the specific material facts on which the motion is based and cite the particular portions of any document relied upon to establish that fact. Defendant's request to dispense with this requirement, *see* Doc. 98-1 at 12 n. 6, is GRANTED. *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1083-84 (E.D. Cal. 2011)("In APA cases, such statements are generally redundant because all relevant facts are contained in

---

[4] APA section 706(1) requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Here, the FAC does not contain any such claim.

the agency's administrative record….[R]equests to dispense with the requirement of filing a statement of

facts are routinely granted in this District.").

# V. DISCUSSION

**A.**     **Scope of Plaintiff's APA Claim.**

The FAC alleges defendant violated the APA in several ways:

> 53. The NIJ applied a vague/non[-]existent standard to Pinnacle's body armor to challenge the performance of its used body armor over a period of years. This standard is so vague that Pinnacle had no notice of how to comply with it, and which resulted in the revocation of the "Notice of Compliance[.]"[] The NIJ admitted that no protocol exists to test the performance of used body armor over a period of years. This unknown, secret standard has not been properly promulgated by the NIJ and should not have been applied to Pinnacle's body armor.

> 54. The NIJ applies a "service life" standard to body armor which is tied directly to the length of the manufacturer's warranty. The NIJ required Pinnacle to prove that their body armor will maintain its ballistic integrity over the length of its warranty. The NIJ states that "service life" has nothing to do with the warranty period, rather, it has everything to do with the care and maintenance of body armor.

> 55. The NIJ failed to provide necessary information to Pinnacle about the data upon which the revocation was based, which information would be necessary so Pinnacle could properly respond to the revocation of the "Notice of Compliance" at a meaningful hearing.

> 56. The NIJ failed to provide Pinnacle with notice of a hearing and a meaningful opportunity to be heard regarding both the revocation of the "Notice of Compliance" and the derogatory and unsupported negative statements about the danger in using the body armor.

> 57. The NIJ acted arbitrarily and capriciously, the abused their discretion, their actions were not in accord with law and failed to meet the constitutional requirement, is not supported by the evidence and is unwarranted by the facts.

Doc. 6.

However, in its moving papers and opposition/reply, Plaintiff makes only two central arguments:

(1) that no standard exists for decertifying body armor based on warranty concerns; and (2) that the NIJ

acted arbitrarily and capriciously when it failed to examine relevant data or articulate any explanation

for its action. Doc. 99. These arguments are the foci of the discussion below. Certain related arguments,

raised in Defendant's motion and addressed by Plaintiff in opposition are briefly addressed.[5]

**B.**     **Decertification Standard.**

   **1.**     **The 2005 Interim Requirements Provide an Adequate Standard.**

   Plaintiff argues that NIJ has no standard for decertifying body armor based upon warranty

claims. Doc. 99 at 8. This argument arises directly from the Ninth Circuit's 2011 ruling in this case,

which addressed Defendant's contention that the decertification decision is not reviewable under the

APA because the "agency action is committed to agency discretion by law," 5 U.S.C § 701(a)(2). The

Ninth Circuit first set forth the relevant rules:

> In general, there is a "strong presumption that Congress intends judicial review of administrative action." *Helgeson v. Bureau of Indian Affairs*, 153 F.3d 1000, 1003 (9th Cir. 1998) .... This presumption is overcome only in two narrow circumstances. The first, which is not at issue here, is when Congress expressly bars review by statute. *See* 5 U.S.C. § 701(a)(1) .... The second applies in "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply," *Webster v. Doe*, 486 U.S. 592, 599 1988) [], thereby leaving the court with "no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *see* 5 U.S.C. § 701(a)(2).

> In determining whether judicial review is precluded on § 701(a)(2) grounds, we consider "the language of the statute and whether the general purposes of the statute would be endangered by judicial review." *Cnty. of Esmeralda v. Dep't of Energy*, 925 F.2d 1216, 1218 (9th Cir. 1991) (citing *Webster*, 486 U.S. at 599–601). Therefore, "the mere fact that a statute contains discretionary language does not make agency action unreviewable." *Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994). [¶] We turn to the statute at issue to determine whether the NIJ was bound by a "meaningful standard against which [we can] judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830.

*Pinnacle Armor*, 648 F.3d at 718-19. The Ninth Circuit then examined NIJ's Office of Science and

Technology's ("OST") foundational statute, 6 U.S.C. § 162:

> In this case, the statute tells us that OST, as a part of the NIJ, "shall have the ... dut [y] ... [t]o establish and maintain performance standards ... and test and evaluate law enforcement technologies," as well as "[t]o establish and maintain a program to certify,

---

[5] Defendant briefly addressed in its motion Plaintiff's allegation that NIJ failed to provide Pinnacle with an appropriate hearing and opportunity to be heard. *See generally* Doc. 98-1 at 3, 20-21. Plaintiff failed to respond. This argument is therefore treated as abandoned. Even if not abandoned, this argument was rejected by the Ninth Circuit. *See Pinnacle Armor*, 648 F.3d at 716-17.

validate, and mark ... law enforcement technology products that conform to standards established and maintained by [OST]." 6 U.S.C. § 162(b)(3)-(4). Congress left it to the NIJ and OST to establish those standards. *Id*. § 162(b)(3).

*Id*. at 719.

Finding it also appropriate to "look to regulations, established agency policies, or judicial decisions for a meaningful standard to review," the Court of Appeals noted that the 2005 Interim Requirements "provide that body armor must conform to the detailed ballistic resistance criteria set out in NIJ Standard–0101.04 over its declared warranty period." *Id*. (internal quotation and citation omitted) Furthermore, the 2005 Interim Requirements specify that NIJ "shall" revoke certification when it determines that the evidence and statements the manufacturer submitted are insufficient. *Id*.

The Ninth Circuit concluded that it was appropriate for NIJ to exercise its expertise in determining the sufficiency of a manufacturer's evidence and statements. *Id*. at 720.

> Just because a statute calls on the agency to exercise its "judgment" in making its determination does not necessarily make an agency's action unreviewable. *See Beno*, 30 F.3d at 1066, 1068 (decision of the Secretary of Health & Human Services to grant a waiver to California to permit greater experimentation with administration of welfare benefits was reviewable even though the statute permits the Secretary to authorize waivers only "to the extent and for the period the Secretary finds necessary," and which "in the judgment of the Secretary [are] likely to assist in promoting [statutory] objectives") []. Indeed, although 5 U.S.C. § 701(a)(2) insulates from judicial review agency discretion where there is no law to apply, the APA itself commits final agency action to our review for "abuse of discretion." 5 U.S.C. § 706(2)(A); *see Heckler*, 470 U.S. at 829. <u>Those standards are adequate to allow a court to determine whether the NIJ is doing what it is supposed to be doing: setting out standards and determining whether law enforcement products should be certified under those standards, whatever they may be.</u> *See Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000) ("The fact that an agency has broad discretion in choosing whether to act does not establish that the agency may justify its choice on specious grounds. To concede otherwise would be to disregard entirely the value of political accountability, which itself is the very premise of administrative discretion in all its forms.").

*Pinnacle Armor*, 648 F.3d at 720 (emphasis added).

Plaintiff attempts to build upon the Ninth Circuit's reasoning by arguing that because "the record is devoid of any standard…. it is clear that the NIJ has not done what it is supposed to be doing." Doc. 99 at 8. Plaintiff's argument ignores that the Ninth Circuit explicitly found "the 2005 Interim

Requirements and the statute supply the standard against which we can judge the agency's decision-making." *Pinnacle Armor*, 648 F.3d at 719. The 2005 Interim Requirements require, among other things, that:

> Any body armor model submitted by a manufacturer to the NIJ Voluntary Compliance Testing Program on or after the effective date hereof or otherwise not subject to the Transition Provision (below) shall be subject to the following requirements:
>
>                               \*\*\*
>
> 2.     Either –
>
>         (a)     Submission of evidence (*e.g.*, design drawings and specifications, lists of materials of construction of each component of the model, research, ballistic testing, descriptions of performance characteristics of critical components or materials, *etc.*) that demonstrates to the satisfaction of NIJ that the model will maintain ballistic performance (consistent with its originally declared threat level) over its declared warranty period; or
>
>         (b)     Submission, by an officer of the manufacturer who has the authority to bind it, of a written certification, the sufficiency of which shall be determined by NIJ, that –
>
>                 (1)     The model contains no material listed in an NIJ Body Armor Standard Advisory Notice in effect at the time of submission;
>
>                 (2)     Lists the materials of construction of each component of the model;
>
>                 (3)     The officer, on behalf of the manufacturer –
>
>                         (A)     Reasonably believes that the model will maintain ballistic performance (consistent with its originally declared threat level) over its declared warranty period;
>
>                         (B)     Has objective evidence to support that belief; and
>
>                         (C)     Agrees to provide NIJ, promptly on demand, that evidence;

RAR 141-42. It is undisputed that Pinnacle armor model SOV2000.1/MIL3AF01 was certified under the alternative mechanism permitting submission of a written certification that the manufacturer "[r]easonably believes that the model will maintain ballistic performance (consistent with its originally declared threat level) over its declared warranty period;" that the manufacturer "[h]as objective evidence to support that belief;" and "[a]grees to provide NIJ, promptly on demand, that evidence." *See* AR 163-

69.

As the Ninth Circuit pointed out, the 2005 Interim Requirements further provide that armor "shall be deemed no longer to be in compliance with the NIJ 2005 Interim Requirements" if "NIJ determines, at any time, that the evidence provided to NIJ as described in requirements ¶ 2(b)(3) and/or in connection with the model is insufficient to demonstrate to the satisfaction of NIJ that the model will maintain its ballistic performance (consistent with its originally declared threat level) over its declared warranty period." RAR 143 (emphasis added). As the Ninth Circuit held, this is a standard against which NIJ's decertification decision can be reviewed for arbitrary and capricious decisionmaking.[6]

## 2.    Lack of Technical Standards.

Pinnacle also appears to argue that NIJ has acted unlawfully by applying a subjective, rather than a technical standard to the decertification of model SOV2000.1/MIL3AF01. This argument is based upon 6 U.S.C. § 162(b)(3)-(4), which states, in pertinent part, that:

> In carrying out its mission, [NIJ's] Office [of Science and Technology] shall have the following duties:
> ***
> (3) To establish and maintain performance standards in accordance with the National Technology Transfer and Advancement Act of 1995 (Public Law 104-113) for, and test and evaluate law enforcement technologies that may be used by, Federal, State, and local law enforcement agencies.

---

[6] Plaintiff correctly points out that the 2005 Interim Requirements were not published in the Federal Register and/or made part of the Code of Federal Regulations, but has declined to argue that the 2005 Interim Requirements should be invalidated because they were not promulgated by notice and comment rulemaking. Doc. 107. Instead, Plaintiff argues that because the 2005 Interim Requirements were not promulgated as formal rules, they must be treated as non-binding statements of agency policy, citing *Pacific Gas & Elec. Co. v. Federal Power Commission*, 506 F.2d 33, 38 (D.C. Cir. 1974), which held that "[an] agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy.... When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued." But even if the 2005 Interim Requirements are treated as non-binding statements of agency policy, Plaintiff has made no colorable argument why the policy set forth in the 2005 Interim Requirements is arbitrary, capricious, illogical, or otherwise unlawful or unwise. To the contrary, requiring a body armor manufacturer to certify that it possesses evidence to support a reasonable belief that its product will maintain its ballistic integrity over its declared warranty period is entirely logical and supported by the record. Although not the focus of this case, the record contains evidence pre-dating the 2005 Interim Requirements of problems discovered with another type of body armor, Zylon, problems that motivated the promulgation of the 2005 Interim Requirements. AR 58-137. Moreover, as is discussed in greater detail below, the record amply supports how NIJ applied the 2005 Interim Requirements in this case.

(4) To establish and maintain a program to certify, validate, and mark or otherwise recognize law enforcement technology products that conform to standards established and maintained by the Office in accordance with the National Technology Transfer and Advancement Act of 1995 (Public Law 104-113). The program may, at the discretion of the Office, allow for supplier's declaration of conformity with such standards.

Pinnacle argues that nowhere in this authorization does Congress give NIJ "power to develop a policy of unbridled discretion to apply a secret subjective standard for decertification of body armor based on warranty claims…." Doc. 103 at 2. Rather, Pinnacle emphasizes that Congress authorized NIJ to establish a program to certify law enforcement technology products that conform to standards established by NIJ "in accordance with the National Technology Transfer and Advancement Act of 1995 [(NTTAA)]."

Among other things, the NTTAA, addresses the "utilization of consensus technical standards by federal agencies," and provides that "all Federal agencies and departments shall use technical standards that are developed or adopted by voluntary consensus standards bodies, using such technical standards as a means to carry out policy objectives or activities determined by the agencies and departments." Pub. L. 104–113, March 7, 1996, 110 Stat 775, § 12(d)(1). An exception was created where compliance "is inconsistent with applicable law or otherwise impractical," in which case "a Federal agency or department may elect to use technical standards that are not developed or adopted by voluntary consensus standards bodies...." *Id*. at § 12(d)(3). The NTTAA defines the term "technical standards" to mean "performance-based or design-specific technical specifications and related management systems practices." *Id*. at § 12(d)(4).

Plaintiff appears to argue that the NTTAA requires federal agencies to use "technical standards" at all times, and therefore that "discretion is not part of the equation" because 6 U.S.C. § 162 (b)(3) and (b)(4) call upon NIJ to establish standards and maintain a certification program in conformance with the

NTTAA. Doc. 103 at 2-3. But, Plaintiff's interpretation of the NTTAA's language fails to acknowledge the purpose of the NTTAA, which is to promote efficiency by directing federal agencies to use "voluntary consensus standards in lieu of government-unique standards, except where inconsistent with law or otherwise impractical." OMB Circular A-119; Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities, 63 Fed. Reg. 8546-01 (interpreting § 12(d) of the NTTAA) (emphasis added); *see also* 15 U.S.C. § 272(b)(13) (assigning to the National Institute of Standards and Technology the task of "coordinat[ing] Federal, State, and local technical standards activities ... with private sector technical standards activities ... with the goal of eliminating unnecessary duplication and complexity...."). There is simply no support for an interpretation of the NTTAA that would require an agency to use a technical standard where no such standard exists in either the private or public sectors.

In this light, pursuant to 6 U.S.C. § 162(b)(4), while NIJ's voluntary certification program must measure law enforcement technology products against standards that comply with the NTTAA, this does not mean that such standards must be "technical standards" as that term is defined by the NTTAA. Rather, § 162(b)'s reference to the NTTAA merely means that if technical standards are used, the agency must use standards issued by "consensus standards bodies," unless doing so is unlawful or otherwise impracticable, in which case the government may develop its own standards. Here, it is undisputed that no relevant technical standards were available. *See* RAR 122 (in discussing an unrelated body armor warranty issue, NIJ acknowledged "there is no accepted test protocol to evaluate the performance of used body armor over a period of years of typical law enforcement use"). Nothing in 6 U.S.C. § 162 or the NTTAA requires NIJ to develop such technical standards on its own before imposing some kind of standard on applicants. The 2005 Interim Requirements represent a non-technical standard, requiring certification by an officer of an armor manufacturer that he or she "[r]easonably

believes that the model will maintain ballistic performance (consistent with its originally declared threat level) over its declared warranty period…"; is in possession of "objective evidence to support that belief"; and is willing and able to "provide NIJ, promptly on demand, that evidence." AR 141.[7]

### 3.   Plaintiff's Vagueness Allegation.

Relatedly, the FAC alleges that the applicable standard is so vague that Pinnacle had no notice of how to comply with it. FAC ¶ 53. Although Pinnacle does not move for summary judgment on this ground, Defendant raises the issue in its motion, suggesting that a November 2005 technical workshop on body armor standards "provided both oral and written guidance" to attendees, one of whom was Pinnacle's CEO, Murray Neal. Doc. 98-1 at 17. One topic of discussion at the workshop was how body armor manufacturers could satisfy the 2005 Interim Requirement's provision requiring manufacturers to submit written certification of their reasonable belief that the armor model will maintain its ballistic performance over its declared warranty period. RAR 146-60.

Plaintiff complains that this workshop at best provided only guidance about what NIJ might consider acceptable evidence. Doc. 99 at 17.[8] That the workshop did not define any absolute standards is undisputed. The workshop documents cited by Defendants reveal as much. For example, a document entitled "Breakout Session: Ensuring Service Life Performance" suggests that the written certification requirement could be satisfied in "a number of ways," and included the following information:

- [T]ests on new armor samples do not satisfy this requirement

---

[7] Plaintiff also complains that NIJ has acknowledged that destructive testing is the only way to determine whether a vest comports with ballistic requirements. This, according to Pinnacle, further supports its position that "there is no standard." Doc. 99 at 9. This argument makes no sense. If destructive testing is the only manner by which warranty claims can be supported, then a manufacturer must arrange for destructive testing of armor that has been exposed to appropriate environmental stressors over an appropriate period of time. That destructive testing may be inconvenient does not make it unlawful for NIJ to require some objective proof that body armor will maintain its ballistic integrity over its warranty period.

[8] In support of this argument Plaintiff cites documents that are not in the AR. See Doc. 99 at 17-18 (citing Doc. 2-23 at 7, 17). There is no basis upon which the court may consider this information. Plaintiff's request for the court to take judicial notice of this document has been denied.

- A sound engineering report could describe how the design, materials, construction details are substantially similar to other NIJ compliant armor designs that have performed well over the time period specified and why the design, materials, and construction should be expected to perform acceptably. ***

- For new designs, options are more limited since aged field specimens do not exist. In those cases, valid arguments based on substantial similarity with proven designs would be necessary.

RAR 147. This merely serves to reiterate what has been admitted by NIJ in the record: "no definitive standard exists" against which Plaintiff's warranty evidence can be judged. RAR 418 (NIJ's John Morgan recounting that he told Pinnacle's counsel that NIJ "had no particular, definitive test [of] ongoing performance over a period of time, just our scientific judgment on which the average cop can rely with respect to an NIJ-compliant armor's warranty period."). As discussed above, even in the absence of a definitive (or technical) standard, Plaintiff has cited no authority that suggests it is unlawful for Defendant to demand nevertheless that Plaintiff support its warranty certification with some evidence.

## C.    NIJ's Decertification Decision.

The thrust of Plaintiff's APA claim is its assertion that NIJ acted arbitrarily and capriciously when it decided to decertify SOV2000.1/MIL3AF01. Under the APA's "arbitrary and capricious" standard, a court must defer to the agency on matters within the agency's expertise, unless the agency completely failed to address some factor, consideration of which was essential to making an informed decision. *Nat'l Wildlife Fed'n v. NMFS,* 422 F.3d 782, 798 (9th Cir. 2005). A court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action." *River Runners for Wilderness v. Martin,* 593 F.3d 1064, 1070 (9th Cir. 2010).

In conducting an APA review, the court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made ... and whether [the

agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife,* 273 F.3d 1229, 1243 (9th Cir. 2001). "The reviewing court should not attempt itself to make up for an agency's deficiencies: We may not supply a reasoned basis for the agency's action that the agency itself has not given." *Humane Soc. of U.S. v. Locke,* 626 F.3d 1040, 1048 (9th Cir. 2010) (quoting *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). "The [agency's] action ... need be only <u>a</u> reasonable, not <u>the best</u> or <u>most reasonable</u>, decision." *Nat'l Wildlife Fed. v. Burford,* 871 F.2d 849, 855 (9th Cir. 1989) (emphasis added).

Previous rulings in this case have narrowed the scope of the Court's inquiry to NIJ's August 3, 2007 decision to decertify Pinnacle's model SOV2000.1/MIL3AF01.[9] *See* Doc. 81 at 13-14. The Court has carefully reviewed the entire RAR, and, for the reasons set forth below, finds the challenged decision to be supported amply by the record.

1. <u>June 6, 2007 House Armed Services Committee Hearing on Body Armor Programs.</u>

On June 6, 2007, the House Armed Services Committee held a hearing on Department of Defense Body Armor Programs, the transcript of which appears in the RAR at pages 229-298. The hearing was convened to address, among other things, then-recent media reports comparing approved military body plate-style "Interceptor" body armor to Pinnacle's Dragon Skin technology. The media reports, based upon tests commissioned by NBC News, suggested armor utilizing Dragon Skin technology outperformed Interceptor armor. RAR 229, 234-35. In response to the NBC tests, the Army conducted its own tests of Dragon Skin using the same test protocols it uses to test other types of body armor. *See* RAR 273-74. While the NBC tests were completed all at room temperature, the Army exposed the Dragon Skin armor to extreme temperature variations and chemical agents RAR 230, 234.

The Army's tests revealed a high percentage of "complete penetrations." RAR at 275. According

---

[9] The RAR contains voluminous records concerning additional submissions made by Plaintiff to NIJ after August 3, 2007, as well as NIJ's responses thereto. No party has presented a basis for the Court to consider this post-decisional information.

to General Ross Thompson III, who testified at the hearing, "[t]he bottom line is that the Dragon Skin vest did not stop the bullets." *Id*. Among other specific concerns, Army tests indicated that Dragon Skin "suffered catastrophic failure of the ceramic disc containment grid adhesive" at extreme temperatures. AR 219.

Pinnacle's CEO, Murray Neal, who attended the hearing, disputed the results of the Army's tests, claiming that the shots the Army labeled as complete penetrations were actually defeated by the Dragon Skin armor. RAR 240.[10] However, other Army witnesses insisted that the shots in question were complete penetrations. RAR 280. Mr. Neal also disputed the Army's conclusion that the disc adhesive had failed at high temperature, explaining that subsequent inspection revealed a manufacturing defect in the test vests, namely a small gap where no adhesive was present to hold the protective disks in place. RAR 241. At the hearing, Mr. Neal claimed that the adhesive problem had been solved. *Id*. The Court lacks the expertise to determine the extent to which Mr. Neal's rebuttals at the hearing overcame the Army's concerns. What the Court can conclude is that, at the very least, the Army's tests raised questions about the ballistic integrity of the Dragon Skin armor design that were not completely resolved at the hearing.

### 2. NIJ's Call for Pinnacle's Warranty Evidence.

John Morgan, NIJ's Deputy Director for Science and Technology, was present at the House hearing. RAR 277-79. Approximately one week later, on June 12, 2007, Mr. Morgan emailed some of his colleagues that he was "very concerned about the military testing as it was presented to the [House Armed Services Committee]...." insofar as it indicated "Dragon Skin does not maintain its structural integrity under heat, cold, or temperature cycling conditions." RAR 299. He felt that "the military results [were] sufficient to put Dragon Skin on a Body Armor Safety Notice" but wanted input from others

---

[10] Mr. Neal's presence at this hearing belies Plaintiff's allegation that it had no notice of the information upon which the revocation decision was based. *See* FAC ¶ 55.

before proceeding. *Id*.[11] In response, Kirk Rice[12] noted that he too had seen the Army's briefing package, which "indicate[d] undesirable disk movement," but also acknowledged that the briefing package predated conversations Mr. Rice had with Mr. Neal about improvements Pinnacle claimed it had made with regard to its adhesives. RAR 301. Accordingly, Mr. Rice indicated that he saw "two near-term alternatives: (1) move straight to a Body Armor Safety Notice, or 2) ask for the data per paragraph 2(b)(3)(c) supporting Pinnacle's attestation in the 2005 IR forms that 'ballistic performance will be maintained over the declared warranty period.'" *Id*. "Either way" according to Mr. Rice, "without evidence that the issue is resolved, and with evidence that it was a problem, it makes sense to pursue this further." *Id*.

In a June 22, 2007 letter, NIJ called upon Plaintiff to provide the "data or objective evidence that supports Pinnacle Armor's belief that model SOV2000.1/MIL3AF01 will maintain its ballistic performance (consistent with its originally declared threat level) over its declared warranty period of six years." RAR 336.

### 3.   **Pinnacle's First Data Package.**

In response, on June 27, 2007, Pinnacle submitted a data package ("First Data Package") consisting of materials Pinnacle had in its possession at the time it applied for NIJ certification. RAR 336. The following was included in the First Data Package:

- A testimonial from a Fresno area peace officer who purchased a "SOV-2000, 'Dragon Skin' total wrap vest" six years earlier. RAR 340. He sates in the testimonial that the vest had been exposed to temperatures ranging from below freezing to possibly as high as 130

---

[11] The record also suggests that at one point Pinnacle may have labeled as compliant with NIJ standards some non-compliant body armor. RAR 274, 365, 363A-D. Because this labeling issue was not offered by NIJ as a basis for decertification, the issue is not discussed further herein.

[12] The RAR does not indicate clearly whether Kirk Rice and Lance Miller, mentioned below, worked for NIJ, a contractor, or some other entity. Regardless, John Morgan sought and incorporated their advice into his decisionmaking.

degrees Fahrenheit in the trunk of his patrol vehicle and that the vest had also been exposed to "soaking sweat, rain, fog, dog slobber, [and] chemical agents, etc." RAR 341. He further states that the vest "protected [him] for 6 years without … ceramic disks coming loose, any problems with adhesive qualities of the disc while encased in the carrier, any fabric or textile problems with the carrier other than the normal duty 'wear and tear,' construction and fit, durability and function." *Id*. Finally, he explained that a Pinnacle Armor agent had recently inspected this vest, finding that it "passed inspection" and extending the warranty for another term. *Id*.

- Photos of two "panels" manufactured in 2002. RAR 342-45.

- A report from US Test Labs ("USTL") reflecting ballistic testing performed on a vest turned in after 4 years of service. RAR 346-48.

- A Testimonial from a DynCorp contractor who served in the War on Terror and who was shot with an AK-47 while wearing Dragon Skin body armor, ostensibly after one year of use. RAR 338, 348. The contractor walked away from the incident and credits his Pinnacle Armor for saving his life because the bullet hit him in an area that he believes would not have been covered by typical "plate coverage." RAR 348. Attached are what appear to be pictures of this individual's armor, post shot, as well as pictures of the vehicle in which he was traveling. RAR 349-54.

- A testimonial from an "independent contractor" who served in the War on Terror and wore Pinnacle Dragon Skin armor for over a year. RAR 355-56. This individual, who identifies himself only as "MK," states that the armor is the "most comfortable … [he] has ever worn" and that it has "held up well over the last 18 plus months and … still look[s] new." RAR 356.

23

- A testimonial another DynCorp employee whose vehicle was hit by an IED near Najaf, Iraq. RAR 357-58. At the time, this individual was wearing Pinnacle body armor and credits the vest with saving him from serious internal injuries from shrapnel. *Id*. Attached are what appear to be a picture of the vehicle after the IED explosion, as well as an image of the testifying individual wearing body armor. RAR 360-61.

**4.      NIJ's Analysis of Pinnacle's First Data Package.**

On June 29, 2007, Marc Caplan, Chief of the Operational Technologies Division at NIJ, reported in an internal email to John Morgan that Caplan had performed an "initial review" of the First Data Package and found it wanting, but sought additional opinions:

> Based on my initial review, it does not appear that Mr. Neal provided any substantial data or objective evidence that would lead one to believe the armor would maintain its ballistic performance over its declared warranty period. The information he provided included several testimonials from purchasers, photographs of armor panels [Neal] states were manufactured in 2002 and that he intends to shoot, and a test report from USTL for an armor that he identified as being returned from the field after four years of service.
>
> I have also asked Lance [Miller] and Kirk [Rice] to review the information that was provided by Mr. Neal to help determine whether there was any substantial data or objective evidence. In addition, I asked Kirk [Rice] to examine the data provided by the Department of Defense that originally raised our concerns with the mechanical integrity of the "Dragon Skin" component of [the] body armor. I hope to be able to report their findings to you by early next week.

RAR 364. Later that morning, Lance Miller sent a response that was curt but clear: "I've been focused on [other] issues, but shooting from the hip, [I] don't see much of any value [in the submission], other than testimonials. Really thin on data." RAR 365. Soon thereafter, Kirk Rice provided a more detailed response, in which he opined:

> I agree with the views expressed [by Lance Miller and Marc Caplan].... I believe the primary motivation of section 2(b)(3)(B) of the 2005 [Interim Requirements] is that the manufacturer "has objective evidence to support that belief" ... and I would contend that testimonials do not satisfy that condition. Circumstances and particular details mentioned in the testimonials cannot be confirmed or measured objectively.

24

The only objective data provided were the test results from USTL, but even those data sheets are problematic. They do not indicate what the test item was … there are no independently confirmed construction details, model numbers, etc., on the data sheets. It appears that someone made a handwritten annotation of a model designation in the upper right corner of the sheets. This is a critical point – there have been a number of variations on the "Dragon Skin" concept, and many of the model designations bear a close resemblance to each other, so confirming that the tested items were the same as the subject model would be important, but even this confirmation cannot be made. Even if the tested items were identical to the subject model, the data on the sheets are quite sparse. One of the threat rounds selected is the NATO M80 round (which is the actual NIJ level III threat), the other round would generally be considered a lesser threat (5.56 mm M855). Also, all of these USTL tests were conducted at 0 degrees impact … no angled shot, and certainly not consistent with the flexible armor test protocol advocated by NIJ.

I am also concerned by some of the testimonials. In particular, on one of them it almost sounds as if the individual making the testimonial was led with specific questions about ceramic discs adhesion issues – why else would they respond in their testimonial that they didn't see any problems with disc bonding? I suspect attempts were made by Pinnacle to address issues identified during the Army tests. I would have expected this data call to turn up evidence that the company had conducted tests to confirm that the problem was solved. This submission does not contain any data to confirm that.

RAR 365.

Later that afternoon, Lance Miller added:

… I concur with Kirk. I believe what has been provide falls well short of what we would hope to see a manufacturer provide in response to our request for data pursuant to their IR Certification. There is the barest minimum of ballistic test data, and nothing which speaks to the concern posed in [NIJ's] June 22, letter, with respect to the effects of exposure to heat or cold.

RAR 375.

### 5.    **NIJ's Formal Decertification.**

Within a few days, NIJ staff drafted a letter indicating that Pinnacle's SOV200.1/MIL 3AF01 would be deemed no longer in compliance with the NIJ 2005 Interim Requirements. RAR 375-78. Shortly thereafter, staff began to finalize a press release regarding the decertification of this body armor model. RAR 391-95. The letter and press statement then went through several rounds of revisions and approvals, all of which took several weeks. RAR 396-414. The final letter, issued on August 3, 2007,

25

informed Pinnacle that the evidence provided by Pinnacle "is insufficient to demonstrate to the

satisfaction of NIJ that the model (SOV2000.1/MIL3AF01) will maintain its ballistic performance

(consistent with its originally declared threat level) over its declared warranty period." RAR 415.

Accordingly, effective August 3, 2007, the model in question was "deemed no longer in compliance

with the NIJ 2005 Interim Requirements" and was "removed from any NIJ list of models that comply

with the Requirements." *Id*. Pinnacle was further warned that armor manufactured during a period in

which the army was found non-compliant with NIJ requirements may not be labeled as compliant. *Id*.

The associated press release, issued the same day, reiterated these points, stating that NIJ determined

that the model SOV 200.1/MIL3AF01 "is not in compliance" with NIJ's requirements because the

"evidence provided by [Pinnacle] is insufficient to demonstrate that the body armor will maintain its

ballistic performance over its six-year declared warranty period." RAR 416.[13]

### 6.   **Analysis**

The key inquiry here is whether the agency's decision is "founded on a rational connection

between the facts found and the choices made ... and whether [the agency] has committed a clear error

of judgment." *Ariz. Cattle Growers' Ass'n,* 273 F.3d at 1243. There really can be no debate that the

agency acted reasonably in calling for Pinnacle's warranty data. Given the results of the June 6, 2007

House Armed Services Committee hearing, it would have been irresponsible for NIJ to not do so.

Plaintiff does not suggest otherwise.

The crux of the dispute is whether there was a rational basis for NIJ's response to Pinnacle's

First Data Package. The internal NIJ communications reveal the substance of NIJ's concerns over the

---

[13] Plaintiff makes much of the fact that NIJ's internal records indicate that key personnel decided it would be appropriate to decertify SOV200.1/MIL 3AF01 less than a week after Pinnacle sent in its First Data Package, yet this was followed by a period of several weeks during which time the agency debated how to phrase the decertification letter and related press release. Although this arguably reflects poorly on the agency's priorities and its internal approval process, the Court is not the arbiter of such matters. An agency is presumed to act regularly absent clear evidence to the contrary. *Rock Creek Alliance v. U.S. Fish & Wildlife Serv*., 663 F.3d 439, 443 (9th Cir. 2011). The record contains no such clear evidence.

First Data Package, concerns that appear entirely reasonable based upon the materials in the record. It does not take great expertise to understand that the testimonials fail to provide objective evidence that the Dragon Skin models owned by the testifying individuals were exposed to particular environmental stressors. It also does not take any special expertise to recognize that the USTL data fails to address NIJ's warranty concerns in any significant way. USTL performed ballistic tests on a single 4-year-old vest after it was returned from service. Although the results of those tests certainly constitute "objective evidence," there is no information about the conditions the vest may have been subjected to during its service period, nor did USTL expose the vest to adverse environmental conditions during testing.

The Court is left with the inescapable conclusion that Pinnacle's submission left NIJ with no choice but to decertify SOV200.1/MIL 3AF01. The evidence submitted plainly was insufficient to justify a reasonable belief that the body armor would maintain its ballistic integrity over its warranty period. [14] Plaintiff is absolutely correct that NIJ never actually found that SOV200.1/MIL 3AF01 would not maintain its ballistic integrity over its warranty period. But, that is not the relevant inquiry. The 2005 Interim Requirements permitted Plaintiff to certify that it had objective evidence upon which it could base a reasonable belief that SOV200.1/MIL 3AF01 would maintain its ballistic integrity. When called upon to share that evidence with NIJ, Pinnacle presented a package that NIJ reasonably found wanting.

---

[14] Plaintiff points out that NIJ's decertification letter concluded that Pinnacle's data was "insufficient to demonstrate" that the body armor would maintain its ballistic performance over the declared warranty period, while NIJ's initial letter only called upon Pinnacle to submit "data or objective evidence that supports Pinnacle Armor's belief that model SOV2000.1/MIL3AF01 will maintain its ballistic performance (consistent with its originally declared threat level) over its declared warranty period of six years." See Doc. 99 at 16 (emphasis added). First, it is worth noting that NIJ did not pluck the phrase "insufficient to demonstrate" out of thin air. The 2005 Interim Requirements specify that NIJ "shall" revoke certification when it determines that "the evidence provided to NIJ ... is insufficient to demonstrate to the satisfaction of NIJ that the model will maintain its ballistic performance (consistent with its originally declared threat level) over its declared warranty period." AR 143 (emphasis added). Although the distinction between the amount of evidence required to support a reasonable belief and that required to demonstrate that the model will maintain its ballistic performance might make a difference in a closer case, the evidence presented by Pinnacle in its First Data Package is insufficient to satisfy either standard.

Plaintiff repeatedly suggests that NIJ's decision was incorrect on the merits, pointing to various sets of ballistic test data in the RAR. *See* Doc. 99 at 15.[15] In particular, Plaintiff insists that the USTL data submitted with its First Data Package "more than justified a reasonable belief that the body armor would maintain ballistic performance over the declared warranty period." *Id*. at 14-15. Although these tests might indicate that Dragon Skin performs well under certain circumstances, Plaintiff does not explain how this data addresses NIJ's warranty concerns. Moreover, "[t]he [agency's] action ... need be only a reasonable, not the best or most reasonable, decision." *Burford,* 871 F.2d at 855. NIJ's decertification decision was founded upon a rational interpretation of the record evidence.

## VI. <u>CONCLUSION</u>

For the reasons set forth above, Defendant's motion for summary judgment on Plaintiff's APA claim is GRANTED and Defendant's cross-motion is DENIED. The clerk is ordered to enter judgment in favor of Defendant and against Plaintiff and to close this case.

IT IS SO ORDERED.

Dated:   **November 4, 2013**          **/s/ Lawrence J. O'Neill**
                                        UNITED STATES DISTRICT JUDGE

---

[15] Among other things, Plaintiff cites test data that is not part of the RAR, including documents attached to the FAC for which Plaintiff's request for judicial notice has been denied. The Court has only considered data properly before it.

28